UNITED STATES of America

v.

William CURTIS, III.

Crim. No. 80–98.

United States District Court, E. D. Pennsylvania.

July 25, 1980.

Peter F. Vaira, U. S. Atty., Roberto Rivera-Soto, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Donald M. Moser, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

BECHTLE, District Judge.

By Order dated May 27, 1980, this Court denied the post-trial motions of defendant William Curtis, III ("Curtis"), for a new trial or, in the alternative, for judgment of acquittal. This Memorandum Opinion serves to set forth the Court's reasoning and authority for that denial.

This criminal action stems from an indictment charging the defendant with three counts of illegally distributing methamphetamine, 21 U.S.C. § 841(a), and a fourth count of carrying a weapon during the commission of a drug offense, 18 U.S.C. § 924(c)(2). Following a three-day trial, Curtis was convicted by a jury on all four counts. The principle defense offered by Curtis at the time of trial was that of entrapment. The Government proved its case by offering the testimony of an informant, Daniel Davis ("Davis"), who had purchased drugs from Curtis on two separate occasions, and an undercover Drug Enforcement Administration ("DEA") agent who testified to receiving drugs from Curtis in the last charged transaction. All three transactions took place between September of 1979 and February of 1980 at an office building located in Jenkintown, Pennsylvania. The first two transactions involved quantities totalling approximately one ounce of methamphetamine and the last transaction, at which time Curtis was arrested by DEA agents, involved the distribution of approximately one pound of methamphetamine with a value of over $10,000.

After raising entrapment as his major defense, Curtis stipulated: (1) to each of the drug distributions on the dates alleged; (2) that the substances were methamphetamine, an illegal non-narcotic; and, (3) that he was carrying a weapon, without a permit, that was loaded and operable during the last drug transaction. Curtis testified in his own behalf and offered the testimony of several character witnesses.

In his post-trial motions, Curtis raises four points. First, he claims that the Court erred by not limiting the Government

in its cross-examination of the defendant's character witnesses under Fed.R.Evid. 405[1] and 608[2]. The defendant objects to the questions posed by the Government as to whether the character witnesses had

1. Fed.R.Evid. 405 provides:

   (a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

   (b) Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

2. Fed.R.Evid. 608 provides:

   (a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

   (b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

   The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

3. The following colloquy excerpts form the basis for the defendant's objections:

   BY MR. RIVERA-SOTO

       \*    \*    \*    \*    \*    \*

   Q  And you have already heard the questioning that I placed to the other witness, so I make the same question to you, Mr. Clark: Would it surprise you if you knew that this defendant has walked into this court and has essentially admitted that all the three sales occurred including a pound of methamphetamine? Would that change your testimony?

   MR. MOSER: Your Honor, I would object and ask him not to answer the question. The

changed their "opinion" of Curtis after learning that he had admitted at trial that the drug transactions had in fact taken place and that he had been carrying a weapon at the time.[3] Curtis claims that

issue here is not his opinion; the issue here is what he hears from people in the community. [A]nd if I had asked him what is his opinion of Mr. Curtis, the U. S. Attorney would object.

THE COURT: Well, the specific evidence of specific instances that are relevant can be considered by a witness and he can—

MR. MOSER: Judge, most respectfully, he is only testifying as to what he is hearing in the community.

THE COURT: Yes.

MR. MOSER: As to my client.

THE COURT: Objection overruled.

MR. MOSER: All right.

THE COURT: The question is would you change your opinion if you learned that fact?

MR. MOSER: Judge, I have to respectfully object. It is not his opinion that he changes; he is here to testify as to the opinion of people in the community.

THE COURT: Well, that's what I am saying. He is conveying that. He has testified what he has learned from members of the community. Based upon what he has heard he has—

MR. MOSER: Most respectfully, the question should be, with the people in the community, would they change their opinion, not his.

THE COURT: Objection overruled.

A  Could you please repeat the question?

BY MR. RIVERA-SOTO:

Q  O.K. Would you change your opinion, the one that you just stated to this jury, if you knew that the defendant, William Curtis, III, walked into this courtroom and admitted selling three times methamphetamine up to the quantity of one pound of 80 percent pure plus unlawfully carrying a gun at the same time? Would that change your opinion?

N.T. 2–9, 10 (Clarke, on cross-examination).

Q  O.K. Now, you testified that among the people that know him he has an excellent reputation for being a law-abiding citizen?

A  Yes.

Q  And I guess that that testimony that you gave to the jury here comes from you having discussions with people about William Curtis; is that right?

A  Discussions and I worked with William Curtis for five years—

Q  Well—

A  —on the job.

Q  Your working with Mr. Curtis on the side —O.K.?—let's talk about what you are talking to the jury about, his reputation in the community.

these questions were intended to inquire of the witnesses' personal opinions of Curtis, which was impermissible because the witnesses were only questioned on direct examination as to their opinion of the character of Curtis based upon what others in the community thought to be his character, and not as to their individual personal opinion of Curtis. The Court finds that the Government's cross-examination of the defendant's character witnesses was permissible as being more probative than prejudicial and within the scope of direct examination. The questions posed by the Government were challenging the credibility and reliability of the opinions of the character witnesses. The challenge went *not* to their personal opinions of Curtis, but to their opinions of what others in the community thought to be the character of the defendant and whether they had knowledge that those persons knew that Curtis had admitted that he had distributed drugs and carried an illegal firearm at the time. This area of inquiry is permitted under the Federal Rules of Evidence. As the United States Supreme Court stated in *Michelson v. U. S.,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948):

A Yes.
Q O.K.?
A Yes.
Q So you have got to talk to other people in the community; right?
A Right.
Q So you have to talk to other people in the community; right?
A Yes, sir.
Q And you have talked to them about William Curtis; right?
A They talked to me about William Curtis, but go ahead.
Q And they talked to you about William Curtis?
A Yes.
Q At any time did anybody talk about the manufacture, the distribution of methamphetamine?
A No, just that there was an arrest and they didn't believe that it happened.
Q They didn't believe that it happened?
A No, right.
Q And nobody talked about illegally carrying a gun, either, did they?
A No.
THE COURT: All right.
BY MR. RIVERA-SOTO:
Q Now, in your opinion, if they talked about it and they had known that the defendant, Curtis, had said, "Yes, I did it, but I didn't have any predisposition to do it," if they knew that the defendant, Curtis, had said that, would that opinion change?
A You asked me if their opinion would change?
Q No, I am asking you if your opinion—
A My opinion—
Q —the one you gave to this jury—
A I wouldn't believe that. I would have problems believing it.
MR. MOSER: Judge—
Don't answer the question, please.
—I am going to object again and if he is going to keep up, I must respectfully ask for a mistrial. It is an abuse of character testimony.

THE COURT: Have any of those persons that you know heard about this case?
THE WITNESS: Yes, sir.
THE COURT: Had any of those persons you heard heard of anything else that the prosecutor has just asked you to your knowledge?
THE WITNESS: Well, I don't know how much they heard, Your Honor.
THE COURT: All right. I will let the testimony stand the way it is. I will sustain the objection.
MR. MOSER: Thank you.
THE COURT: Objection sustained.
MR. RIVERA-SOTO: May I inquire, Your Honor, as to the competence of that opinion which is really all I am getting at?
THE COURT: Well, he said he heard, he perceived others say, that the defendant's reputation for being a law-abiding citizen, a peaceful citizen, was good, and he also said what he believes those persons heard in the community.
MR. RIVERA-SOTO: Can I then pose a hypothetical to the witness on the same ground which is merely all I am doing which is asking him if they knew what the defense in this case was, would they still stand on the same opinion?
THE COURT: How does he know what they would think?
MR. RIVERA-SOTO: Well, he has given—
THE COURT: How does he know what the people in the community would think? He might say what he thinks.
THE WITNESS: He was asking me what I think.
THE COURT: He was telling you what other persons in the community if they had knowledge would think. We just had one witness that said it wouldn't make any difference. So it would only be guessing. I will sustain Mr. Moser's objection.
MR. RIVERA-SOTO: Thank you, Your Honor.
N.T. 2–14 to 18 (Mitchell, on cross-examination).

The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

335 U.S. at 479, 69 S.Ct. at 220 (footnotes omitted). *See also* 2 Weinstein, *Evidence* ¶ 405[03] at pp. 405–21–30 (1979).

The Government, in the within case, attempted and intended to accomplish exactly what the *Michelson* case allows, even though here, unlike *Michelson*, the factual events about which questions were posed related to knowledge of the facts surrounding the very charges for which the defendant was on trial. Nevertheless, the purpose and probative value of the questioning was the same as in *Michelson*—that being to assess the character witnesses' opinion of the character traits of the defendant and was not a "random shot" or a "groundless question" intended to inject unwarranted innuendo to the jury. 335 U.S. at 472 n.3, 481, 69 S.Ct. at 217 n.3, 221. The Government was not questioning the witnesses concerning the arrest and indictment for which Curtis was then on trial. *See U. S. v.*

*Lewis*, 482 F.2d 632, 640–641 (D.C.Cir.1973). Rather, the questions went to factual issues concerning the distribution of drugs and the possession of a firearm that Curtis had stipulated to at the beginning of trial in conjunction with his defense of entrapment. Curtis was denying he possessed the guilty mind to commit the acts, but he was admitting the occurrence of the very factual acts for which he was on trial. Placed in that unique posture, the Court finds that, in this case, the questioning was permissible and probative of the character traits of Curtis allegedly known in the community at the time of trial for which the character witnesses were being challenged. *See also* N.T. 4–25 (Court's charge concerning character testimony); N.T. 2–2 (Court's instructions to the jury prior to testimony of character witnesses); N.T. 4–4, 11 to 13 (charge of Court concerning elements of entrapment defense and defendant's admission of factual events).

▪ Second, Curtis objects to the following comment by the Government in its rebuttal argument:

Well, ladies and gentlemen of the jury, you remember the direct examination of William Curtis and you remember the cross-examination of William Curtis and there was just one question that was asked of Mr. Curtis.

And by that I ask the Court's leave to argue this, Your Honor.

And that is, why didn't you tell the story to anyone before?

N.T. 3–47.

Curtis claims that the comment by the Government violates the rule of *U. S. v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), prohibiting negative inferential comments or questions by the prosecution as to a defendant's post-arrest silence after being given and exercising his *Miranda* rights. The standard, as set forth by the Supreme Court in *Doyle*, is that a negative inferential comment on the defendant's post-arrest silence would be:

fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. 426 U.S. at 618, 96 S.Ct. at 2245.

Therefore, the first question that the Court must ask under *Doyle* is whether the comment concerned Curtis' post-arrest silence or his pre-arrest silence. The Supreme Court has recently held that the *Doyle* decision is limited to inferences concerning post-arrest and not pre-arrest silence, and that comments on the latter were permissible and not violative of the Fifth Amendment right to silence. *See Jenkins v. Anderson,* —— U.S. ——, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). *See also U. S. v. Agee,* 597 F.2d 350, 356 n.19 (3d Cir. 1979) (en banc); *U. S. v. Cianciulli,* 482 F.Supp. 585, 612 (E.D.Pa.1979), *aff'd,* 624 F.2d 1091 (3d Cir., 1980).

The remark in issue here was, "[w]hy didn't you [Curtis] tell the story to anyone before?" N.T. 3–47. The Court finds that the remark is ambiguous and, therefore, could have reasonably been understood by the jury to mean—why did the defendant not tell anyone, including the police, friends or his family, *prior* to his arrest, about the alleged frame-up he was being subjected to by the Government's informant (Davis) over the course of the entrapment period. This resultant ambiguity surrounding the Government's rebuttal comment only serves to dissipate any prejudicial effect the remark might have occasioned in the minds of the jurors. *See U. S. v. Agee, supra,* 597 F.2d at 359.

█ If any prejudicial effect did result, it was, in any event, effectively negated by the Court's prompt curative instruction given to the jury at the request of defense counsel immediately following the Government's comment.[4] In *Doyle,* the trial court did not make such prompt, extensive curative instructions to the jury. Finally, in *Doyle,* the comments by the Government found to be prohibited were extensive and repeatedly asserted by the prosecution, only serving to reinforce the finding that the remarks were both intentional and prejudicial, thereby rising to the level of a constitutional violation. *Doyle, supra,* 426 U.S. 613–614, 96 S.Ct. 2242, 2243. *See U. S. v. Agee, supra,* 597 F.2d at 358 n.26. Here, the comments were brief, isolated in context and ambiguous; and, in light of the Court's prompt and extensive curative instructions, it can be easily said that all of these factors served to effectively neutralize any possibility of any prejudicial effect on the jury. *See U. S. v. Agee, supra,* 597 F.2d at 358, 359 n.30.

For the above reasons, the Court finds that the rebuttal remarks of the Government were neither intended to be, nor did they have the effect of being, an impermissible inferential comment on Curtis' post-

---

4. THE COURT: Well, members of the jury, when a person is arrested as Mr. Curtis was he has the right to say nothing. Everyone has that same right under the Constitution just to remain silent when they are in police custody. It is a right that everyone has. And to remain silent does not mean that you have done anything. You are permitted to remain silent because the Constitution says so, not because you are hiding anything.

So Mr. Curtis explained when he was asked by Mr. Rivera-Soto when he was with the police after his arrest why he didn't tell them the story he explained. He wanted to get a lawyer. He has this right and you should not infer because Mr. Curtis remained silent that time anything adverse to him. All right?

So get on to something else.

MR. MOSER: Thank you.

THE COURT: It was that and that is the extent of it and the only implication that can be drawn is what you heard Mr. Curtis testify to. Everyone has that right and it is an important right and it is a right that cannot be used as any kind of evidence to suggest something wrong because many times persons don't know the intricacies of the law, what should be done or not done, and that's why our Constitution strictly enforces a right to say nothing in the face of an arrest, whether or not you have done anything wrong, whether or not there is any evidence or not.

So silence has no adverse implication whatsoever.

Go ahead.

MR. RIVERA-SOTO: Thank you, Your Honor.

N.T. 3–47 to 49. *See also* N.T. 3–36 (comments of defense counsel on duty of Government to prove case beyond a reasonable doubt).

arrest silence of the type prohibited by the *Doyle* and *Hale* decisions.

Third, Curtis contends that the Court erred in responding to two questions posed by the jury during the course of their deliberations. The questions were:

And the note reads: "Could the defense have recalled Davis on Wednesday?" That's the first question.

The second question is: "Or could the defense, when Davis was dismissed, have made a request to have Davis available for later questioning?"

N.T. 4–48. After soliciting suggestions from counsel, the Court responded to the jury in open court:

Now, let me discuss the first question first: "Could the defense have recalled Davis on Wednesday?"

The answer to that is a relatively simple answer, but I want to make sure we understand the word "recall."

If you mean "recall after he left," bring him back, the answer would be "Yes."

Actually, the defendant didn't put Davis on as his witness. Usually when a person puts a witness on, then they put him back on again and it is recalling the witness. So technically speaking, Mr. Curtis couldn't recall Davis because he never called him in the first place.

But if we change that word from "recall" to "call," let me read it that way:

"Could the defense have called Davis on Wednesday or brought him back to court or had him subpoenaed for a question?"

The answer is: Yes, the defendant would have the right to do that. The Government would also have the right

to do that, to have Davis brought back. So either party would. All right?

Now, the second question is:

"Or could the defense, when Davis was dismissed, have made a request to have Davis available for later questioning?"

Well, the answer to that is: Yes. The Government could also have done that. Or a witness can be subpoenaed, what we say, issue a subpoena for a witness, and it is an order for him to appear in court. So there are a variety of ways of having witnesses appear in court. They can do so willingly. They can be told by the Court to come back. Or they can be subpoenaed.

So that's a discussion of the questions, and in summary, then, what the answer is, the answer is: "Yes, he could have been called by the Government or by the defense after he left the courthouse."

That's the extent of the answer. And does that answer your question?

THE FOREMAN: Thank you, Your Honor. Yes.

N.T. 4–48–49.

Curtis objects that the clarifying remarks of the Court should have included instructions that the defendant had no duty to call any witnesses and that the burden of proof and production remains with the Government to show guilt beyond a reasonable doubt.

As the Court stated to defense counsel after the above clarifying response [N.T. 4–49–50], the Court had already in its charge to the jury fully and clearly instructed that the defendant has no duty or burden to call any witnesses at all, and that the burden of proof and production always remains with the Government.[5]

---

5. The Court stated in its charge:

I have made reference to the standard that the Government's proof must rise to is what we call beyond a reasonable doubt. Beyond a reasonable doubt means in the law just what the words imply, namely, a doubt founded upon some good reason. It does not arise from sympathetic feelings or a desire to

avoid performing a disagreeable duty. It must not be a whim or a vague doubt or a misgiving founded upon mere possibilities. On the other hand, beyond a reasonable doubt does not mean beyond all doubt and does not mean to an absolute certainty. It must be a doubt such as would make an honest, sensible, and fair-minded person hesi-

■ The Court finds its response to the two questions posed by the jury during deliberations to be legally proper and comprehensive in light of its prior instructions, which the Court believes the jury fully understood and could continue to follow during the remainder of their deliberations without further comment from the Court.

■ Another claim raised by Curtis concerns the Government's characterization during its rebuttal argument of Curtis as a "liar" based on his trial testimony [N.T. 3–50]. The Court does not condone the characterization, but it does not find it was so prejudicial to Curtis as to violate his right to a fair trial. The phrase was intended to be a persuasive point of argument to the jury by the Government that they should find the defendant's testimony not believable and to be contrary to the weight of the evidence presented by the Government chiefly through the testimony of its informant witness. *See U. S. v. Siegel,* 587 F.2d 721, 727 (5th Cir. 1979). The Government's use of the word "liar" was not the first use or variation of that word made during the course of the trial. Defense counsel stated to the jury during his closing argument, immediately prior to the Government's rebuttal, that:

> He hasn't *lied* to this Court. He has been truthful through the entire case. If he was going to *lie* he should have denied even being there. I mean, if you are going to give the jury and the judge a *bunch of bull,* you might as well go the other way. But he doesn't do that. He tells you what happened. And it is a pathetic story and it might even be a little bizarre. But you know, ladies and gentlemen, unfortunately sometimes the truth is bizarre and it is pathetic. And in this case I submit that's what it is.

N.T. 3–19 (emphasis supplied). *See also* N.T. 3–15, 16, 30 (statements by defense counsel that the Government's informant

had "lied" and his testimony was a "bunch of baloney").

Therefore, the Government's remark in its rebuttal argument was only a reiteration and recharacterization of the terminology that defense counsel had previously selected to describe the testimony of the defendant and the chief Government witness.

■ Finally, whatever prejudicial inferences might have been drawn by the Government's remark, the Court's instructions to the jury immediately following the Government's remarks served to cure any prejudicial effect the comment may have had:

> It is not my role to assess all of that testimony and suggest to you this or that or remind you of this fact or that fact. That's your job. That's your job and it is counsel's job in their arguments which are a very important part of the case to try to remind you of certain facts that they think are important and you may think they are important. Maybe you won't think they are important, but it is up to you to decide what those facts are. It is not my job to review all of that evidence and I don't do that.

N.T. 4–5, 6.

> It is the obligation of attorneys to represent their clients with vigor and with the conviction that [what] they are doing is correct and proper.

N.T. 4–18.

> You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief.
>
> \*  \*  \*  \*  \*  \*
>
> Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or

---

tate to act in the most important affairs of that person's life.

The burden is *always* upon the Government to prove every essential element of the crime charged beyond a reasonable doubt and this burden never shifts to a defendant.

The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence whatsoever.

N.T. 4–24 (emphasis supplied).

may not cause you to discredit such testimony. Two or more than two persons who perceive or witness an accident or a transaction or event oftentimes see or hear it differently.

N.T. 4–19.

The testimony of a witness may be discredited or impeached by contradictory evidence, in other words, by evidence that at some other time the witness has said or done something or has failed to say or do something that is inconsistent with his testimony here before you in this courtroom. If you believe a witness has been impeached in that manner and thus discredited, it is your exclusive province as jurors to give the testimony of that witness the weight if any that you think it deserves. And as I mentioned earlier, if a witness is shown knowingly to have testified falsely concerning any material matter you have a right to distrust that witness' testimony in other particulars and you may reject all the testimony or accept all or part of that testimony as you determine it deserves.

N.T. 4–21. *See also U. S. v. Rodriguez,* 585 F.2d 1234, 1244 (5th Cir. 1978); *U. S. v. Rich,* 580 F.2d 929, 936 (9th Cir. 1978); *U. S. v. Morris,* 568 F.2d 396, 402–403 (5th Cir. 1978); *U. S. v. Austin,* 548 F.2d 759, 760 (8th Cir. 1977); *U. S. v. Erb,* 543 F.2d 438, 442 (2d Cir. 1976); *U. S. v. Benson,* 487 F.2d 978, 982 (3d Cir. 1973).

The final claim raised by the defendant in his post-trial motions is equally without merit—that claim being that the verdict was contrary to the weight of the evidence. The Government presented two major witnesses who testified that the illegal drug transactions were willfully and voluntarily entered into by Curtis after he was approached by the Government's informant for the purpose of purchasing drugs. The transactions took place and money was exchanged and, during the last transaction, Curtis was arrested by DEA agents and found to be carrying a firearm. The conflicting reasons as to why the transactions occurred ultimately were bottomed on a question of the credibility of the testimony of Curtis versus the Government's informant. This issue was properly presented to the jury, whose verdict reflects their finding, and which the Court finds to be supported by the evidence presented at trial.

This Memorandum Opinion is in support of the Court's Order of May 27, 1980.