**UNITED STATES of America**

v.

**Steven LEHR.**

**Crim. No. 81–325.**

United States District Court,
E.D. Pennsylvania.

April 22, 1983.

Joseph M. Gontram, Judy Goldstein, Asst. U.S. Attys., Philadelphia, Pa., for plaintiff.

Robert E. Madden; Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

In this case, Steven Lehr[1] was convicted of conspiring to manufacture, possess, and distribute phencyclidine (PCP), and to distribute and possess cocaine in violation of title 21, United States Code, sections 841(a)(1) and 846. Defendant's post trial motions contend there was insufficient evidence to support his conviction of conspiracy to distribute PCP *and* cocaine, and that there was error in pre-trial and trial rulings. For the reasons which follow, his motions must be denied.

Viewed in a light most favorable to the Government, as the jury's verdict requires, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence showed that Steven Lehr was integrally involved in a drug manufacturing and distribution scheme for several years headed by his brother, Richard Lehr. The testimony revealed that the conspiracy focused primarily on manufacturing and distributing PCP in the form of "killer weed" sometimes known as "green". Specifically, the evidence showed that certain of the conspirators, including Steven Lehr, first manufactured PCP in liquid form,[2] and then mixed the liquid with parsley flakes thereby forming the killer weed. The killer weed was delivered in one to five pound quantities to other conspirators who then sold the substance in smaller quantities. The evidence further showed that members of the drug-selling ring sold or imported cocaine from Florida for distribution in Eastern Pennsylvania and elsewhere.

While Steven Lehr does not contend there was insufficient evidence linking him to the PCP manufacturing and distribution scheme, he does argue that the record is devoid of evidence linking him to a distribution ring involving both PCP and cocaine. This contention is meritless. Suffice it to say that the record is replete with testimony of defendant's participation in virtually every aspect of the PCP scheme. First, the evidence showed he was involved in the manufacturing process by obtaining labora-

---

1. Steven Lehr was indicted with eleven other people all of whom entered pleas of guilty.

2. The evidence also showed that some of the conspirators were involved in gathering the necessary chemicals and laboratory glassware for the manufacturing process.

tory glassware, helping "cook" the chemicals, and preparing the glassware for its next use. Second, several witnesses testified that defendant purchased the parsley flakes and mixed them with the liquid PCP to form killer weed. Finally, there was testimony that defendant regularly distributed killer weed to other co-conspirators and later collected the money generated from their sales.

■ Although scant compared to that dealing with PCP, the evidence as to cocaine was sufficient to show its possession and distribution also was an object of the conspiracy. The cocaine incidents were related by William Nattress, an unindicted co-conspirator who cooperated with the Drug Enforcement Administration (DEA) during its investigation. Nattress testified that in November, 1978, he was summoned by Richard Lehr to Springton Manor, a house that then was the base of operations of the conspiracy. Upon his arrival at the house, Nattress observed defendant, Richard Lehr, and Joseph Connehey, another co-conspirator, mixing a quantity of cocaine with a neutral substance, and personally using it. Nattress soon was informed that Richard Lehr was going to California and then to Florida on business, Nattress was to care for the house during Lehr's absence, and a quarter pound of cocaine would be left with Nattress for his use or sale. Nattress testified that Richard Lehr was going to California to sell cocaine and to Florida to get more. Nattress further testified he sold one ounce of cocaine to James "Biggie" Slaughterback, and that defendant, as he did when killer weed was sold, collected the money from Slaughterback. Additionally, Nattress testified that Richard Lehr telephoned from Florida, instructing him to direct Steven Lehr to send a drug-weighing scale and money to purchase drugs to Richard in Florida. The money was sent as Richard said it should be.[3] Although Rich-

ard Lehr returned with no drugs, shortly thereafter, Neal McCrossen, another co-conspirator, and Connehey, arrived from Florida with a large quantity of cocaine. The logical inference from this testimony was that Richard Lehr travelled to Florida from California, purchased a quantity of cocaine with the money sent by defendant, and then directed Connehey and McCrossen to transport the cocaine to Pennsylvania. Because it involved at least five members of the conspiracy, money generated from drug sales by conspirators, and equipment used by the conspirators to weigh other drugs, the cocaine transactions described by Nattress clearly were directed and financed by members of the PCP distribution ring. Furthermore, it is equally clear that defendant participated in this aspect of the conspiracy by being present when cocaine was adulterated, by collecting money after Nattress sold cocaine, and by sending money to his brother in Florida to purchase the cocaine. Therefore, there was evidence from which the jury could find that the conspiracy had as an object the possession and distribution of cocaine, in addition to PCP, and defendant's personal involvement therein. Even if the evidence did not show Steven Lehr's personal involvement in matters pertaining to cocaine, his voluntary and knowing continued participation in other activities of the conspiracy would render him liable for its acts dealing with cocaine. Accordingly, the evidence supported the jury's verdict, thus making denial of defendant's post trial motions on this ground necessary.

### Exceptions to Grand Jury Proceedings

Defendant next contends I erred in refusing his pretrial motions for disclosure of grand jury transcripts and for dismissal of the indictment based on prosecutorial misconduct.[4] There was no error in my rulings.

---

**3.** The scale was transported to Florida by Neal McCrossen, another co-conspirator.

**4.** Defendant also argues I erred in refusing to dismiss the indictment based on inadequate instructions to the grand jury. This issue has

been laid to rest in this district and thus, there was no error in my ruling. *United States v. Hart,* 513 F.Supp. 657 (E.D.Pa.1981); *United States v. Shober,* 489 F.Supp. 393, 405–409 (E.D.Pa.1979).

During the grand jury testimony of James Carpenter, III, an eventual co-defendant of Steven Lehr, the prosecutor, out of the presence of the witness, stated to the grand jurors that in the government's opinion, the witness had committed perjury and that it would be investigated. Additionally, in response to a comment by a grand juror that Mr. Carpenter smelled of PCP, the prosecutor commented that he had tried a case involving methamphetamine "and the courtroom stunk." When these matters were brought to my attention, I requested the Government to submit to me all of the grand jury transcripts for an *in camera* examination. After reviewing the transcripts, I denied the motions for disclosure and to dismiss.

■ As to disclosure of grand jury matters, rule 6(e)(3)(C)(ii) of the Fed.R.Crim.P. provides that:

> (C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—
>
> .　　.　　.　　.　　.
>
> (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

Fed.R.Crim.P. 6(e)(3)(C)(ii) (1982). Notwithstanding the plain language of Rule 6(e), courts have required a defendant to make a showing of "particularized need" prior to the court authorizing disclosure. *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). "Particularized need" has been defined by Justice Powell as follows:

> From [*United States v.*] *Procter & Gamble* [*Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) ] and *Dennis* [*v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) ] emerges the standard for determining when the traditional secrecy of the grand jury may be broken: Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceed-

ing, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.

*Douglas Oil, supra,* 441 U.S. at 222, 99 S.Ct. at 1674 (citations omitted).

Because the aforementioned portions of Mr. Carpenter's grand jury testimony may have led defendant to believe that similar comments by the prosecutor occurred during the testimony of other witnesses and thus, give him additional fuel for a motion to dismiss based on prosecutorial misconduct, I conducted an *in camera* review of the grand jury material. *United States v. Singer,* 660 F.2d 1295, 1302 n. 15 (8th Cir. 1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982). Had there been instances of similar conduct by the prosecutor, I might have felt compelled to disclose to defendant at least those portions of the grand jury transcripts in which it occurred. *Douglas Oil, supra,* 441 U.S. at 222 n. 12, 99 S.Ct. at 1674 n. 12. Having found nothing I concluded the defendant had not demonstrated a particularized need. There was no error in my ruling.

■ It is clear that "[i]n federal criminal proceedings, the right to indictment by an unbiased grand jury is guaranteed by the fifth amendment." *United States v. Serubo,* 604 F.2d 807, 816 (3d Cir.1979) (citation omitted). "*United States v. Bruzgo,* 373 F.2d 383 (3d Cir.1967) and *United States v. Riccobene,* 451 F.2d 586 (3d Cir.1971), both recognize the authority of . . . [the] court, in the exercise of its supervisory power, to order dismissal of the indictment as a remedy for prosecutorial misconduct before the grand jury." *Id.* Quoting ABA Standards Relating to the Prosecution Function and the commentary thereto; the United States Court of Appeals for the Third Circuit stated in *United States v. Birdman,* 602 F.2d 547 (3d Cir.1979):

> The prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury.
>
> .　　.　　.　　.　　.

A prosecutor should not, however, take advantage of his role as the ex parte representative of the state before the grand jury to unduly or unfairly influence it in voting upon charges brought before it. *In general, he should be guided by the standards governing and defining the proper presentation of the state's case in an adversary trial before a petit jury.*

*Id.* at 555 (emphasis by Judge Van Dusen). There are no hard and fast rules, however, as to sanctions when the record discloses instances of prosecutorial misconduct before the grand jury. After noting that both *Bruzgo* and *Riccobene* spoke in terms of suppression of the evidence after a showing of actual prejudice,[5] the court in *Serubo* stated:

> Our reading of *Birdman* is that dismissal of the indictment may be proper even where no actual prejudice has been shown, if there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends, or that the type of misconduct challenged has become "entrenched and flagrant" in the circuit.

*United States v. Serubo, supra,* 604 F.2d at 817. This rule, establishing dismissal as an appropriate sanction even where no actual prejudice has been shown, may not still be applicable in light of the Supreme Court's holding in *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). In *Morrison,* the Court, in reversing the dismissal of the indictment based on governmental misconduct affecting the defendant's sixth amendment rights, stated that "the solution provided by the Court of Appeals is inappropriate where the violation . . . has had no adverse impact upon the criminal proceedings." *Morrison, supra,* 449 U.S. at 367, 101 S.Ct. at 669. While the rights at issue here are guaranteed by the fifth amendment, it appears that the Supreme Court favors an actual prejudice

standard for pre-indictment misconduct. In any event, defendant is not entitled to relief under either standard.

While the prosecutor's comment about Carpenter's veracity may have been unwarranted and the one about the odor of PCP and methamphetamine uncalled for, dismissal of the indictment as to the defendant would in no way have been an appropriate remedy for the following reasons. First, defendant could not demonstrate that he was actually prejudiced by the prosecutor's comments. Not only was the evidence presented to the grand jury overwhelming to establish probable cause to believe the conspirators committed the crime with which they were charged, there is no reason to presume, under the facts here, that prejudice to Carpenter resulted in prejudice to Steven Lehr. Carpenter never mentioned Steven Lehr by name, and in fact, made only one brief reference to him as Richard Lehr's brother. Moreover, it is possible that the grand jurors did not even think Carpenter was referring to Steven Lehr, and rather believed it was some other brother of Richard Lehr. In any event, regardless of the beliefs of the grand jurors, there was no prejudice as to Steven Lehr because the evidence establishing probable cause was overwhelming. Second, even if the rule enunciated in *Serubo* is applicable, that actual prejudice need not be established if the "challenged activity was something other than an isolated incident . . .", *Serubo, supra,* 604 F.2d at 817, I conducted an *in camera* examination of all grand jury transcripts and determined there were no other instances of conduct before the grand jury which may have been improper. Therefore, the situation here is not the type referred to in *Serubo.* Finally, an appropriate sanction, suppression, was levied against the Government. See note 5 *supra.* Accordingly, there was no reason to dismiss the indictment and I did not err in refusing to do so.[6]

---

**5.** In fact, before Mr. Carpenter entered a plea of guilty in this matter, I entered an order suppressing "his grand jury testimony insofar as the Government's use of such testimony in

its case in chief . . .". Order dated March 30, 1982.

**6.** Two additional grand jury matters warrant comment. First, defendant contends the indict-

**372**

*Objections to Evidentiary Rulings*

Defendant contends I erred in my trial rulings regarding the admissibility of certain evidence. Each objection is meritless and will be addressed *seriatim*.

■ Defendant first argues I erred in permitting the Government to elicit from two witnesses, Nattress and Lanciano, on direct examination that they were testifying pursuant to agreements[7] with the Government which, *inter alia*, subjected them to prosecution for perjury if they testified untruthfully. Defendant contends this constituted improper vouching for or bolstering of the witness' credibility before it was attacked on cross examination. *See United States v. Arroyo-Angulo,* 580 F.2d 1137, 1146 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978). I disagree.

Courts have repeatedly admitted into evidence the terms of an immunity or plea agreement between the Government and a witness which requires the witness to testify truthfully. While such evidence is often admitted on re-direct examination after the witness has been attacked on cross-examination, courts have held admission on direct examination not to be reversible error. *United States v. Barnes,* 604 F.2d 121 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Arroyo-Angulo, supra.* Those

cases found the defendant was not prejudiced by early admission of the plea agreement because the attack on the witness' credibility was inevitable, the witnesses were in fact cross-examined extensively, and the agreement would have been admissible at a later point in time in any event. Recently, in *United States v. Edwards,* 631 F.2d 1049 (2d Cir.1980), the United States Court of Appeals for the Second Circuit stated:

> It is also the rule in this circuit that although credibility generally may not be supported until it has first been attacked, an exception exists which allows the Government to bring out on direct examination the circumstances surrounding a witness' motivation for cooperating with the Government or other matters damaging to the witness' credibility. Admission of this evidence is permitted in order to avoid an inference by the jury that the Government is attempting to keep from the jury the witness' possible bias.

*Id.* at 1051–52 quoting *United States v. Singh,* 628 F.2d 758, 761 (2d Cir.1980) (citations omitted). Interpreting this rule with respect to cooperation agreements, the court further stated:

> The rule of *Arroyo-Angulo* and the doctrine enunciated in *Singh* indicate that the Government may not introduce the entire cooperation agreement on direct

---

ment was defective because no evidence as to possession or distribution of cocaine was presented to the grand jury. This argument is meritless. I reviewed the transcripts *in camera,* and suffice it to say, at least two witnesses testified before the grand jury as to the cocaine transactions described at trial. Second, defendant now moves for disclosure of all grand jury transcripts contending that the reasons for grand jury secrecy no longer apply. This motion must be refused because defendants' premise is incorrect. Commenting on the continued necessity of showing "particularized need", Justice Powell in *Douglas Oil* stated:

> Such a showing must be made even when the grand jury whose transcripts are sought has concluded its operations, as it had in *Dennis.* For in considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to

testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties. Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a company under investigation. Thus, the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities.

*Douglas Oil, supra,* 441 U.S. at 222, 99 S.Ct. at 1674 (citation omitted). For the reasons expressed by Justice Powell, defendant's motion must be refused.

7. William Nattress testified pursuant to an immunity agreement and Raymond Lanciano pursuant to a plea agreement.

examination of its witness since the witness' credibility has not been attacked and the *entire* cooperation agreement bolsters more than it impeaches. See *Barnes, supra.* However, the elicitation of the fact of the agreement and the witness' understanding of it, as a motivation for the witness to testify for the Government, should be permitted on direct examination in order to anticipate cross-examination by the defendant which might give the jury the unjustified impression that the Government was concealing this relevant fact.

*United States v. Edwards, supra,* 631 F.2d at 1052.

The circumstances of the admission of the terms of the plea agreements here complied with both the rule set forth in *Arroyo-Angulo* and *Barnes,* and the innovative approach enunciated in *Edwards.* In his opening statement to the jury, counsel for defendant discussed the fact that the witnesses would be testifying pursuant to immunity or plea agreements.

This case starts with William Nattress, who you are going to hear. . . . Ricky Lehr and Billy Nattress have a falling out. The agents go to William Nattress and said, "We got you. We got you."

. . . They said to William Nattress, "We got you. You can either do one or two things: Either you go down the tube or you do what we want." William Nattress says, "Okay."

Now what does William Nattress get for this? Number one, he get a bi (sic). He is not indicted. He can't be indicted. Nothing that he said can be used against him. It's the same thing as not being indicted.

He got $12,000 at one time from the Government, has been promised $4,500 at the conclusion of the case, cash. He's got $1,100 another time in cash. . . . William Nattress is mad at Ricky already, so what does he do, Ricky? Ricky tells everything. Ricky is guilty, no doubt about it. What does Ricky do? Ricky works a deal with the Government. Ricky's got to testify against Pebbles,

Raymond Lanciano. Ricky is going to testify against Donna Komrous, and here they are with the main man going to testify against them.

What do they do? They look at the life boat and the life boat is full. There is no room in the life boat. Who are they going to testify against? Wait a second, they can testify against Steven Lehr.

Two things are certain, number one, get back at Ricky for testifying about them. Number two, they can get the Judge to take that into consideration. You will hear the deal. They will talk all about the deal. So here these guys are jumping out to get Steven because Steven is the only person they can get back at. Kick Ricky and also save our skin.

N.T. 1.21–1.24. By discussing the terms of Nattress' immunity agreement and mentioning Lanciano's "deal" with the Government, defendant, in effect, began to impeach them, and thus opened the door for the Government to bolster their credibility with the details of the plea agreements on direct examination. Even if counsel's comments in the opening statement cannot be construed as either attacking the credibility of Nattress and Lanciano or referring to plea agreements, admission of the terms of the plea agreement on direct was not prejudicial to defendant in view of the fact that cross examination regarding the plea agreements was inevitable, the cross examination was vigorous and thorough, and the terms of the plea agreements at issue here would have been admissible on re-direct examination. *See United States v. Barnes, supra; United States v. Arroyo-Angulo, supra.* Under the reasoning of the *Edwards* case, "the elicitation of the fact of the agreement and the witness' understanding of it, [as was done here, was properly] . . . permitted on direct examination . . . to anticipate cross-examination by the defendant which might [have] give[n] the jury the unjustified impression that the Government was concealing this relevant fact." *United States v. Edwards, supra,* 631 F.2d at 1052. In any event, whether under *Barnes* and *Arroyo-Angulo* or under *Edwards,* admission of the terms of the agreements of

Nattress and Lanciano on direct examination was not error and did not prejudice defendant.

■ Next, defendant contends I erred in allowing William Nattress to testify on re-direct examination as to a threat defendant allegedly made to him. Nattress initially stated he first was approached by DEA agents in March, 1980, who asked him about the drug selling activity of Richard Lehr. At that time, Nattress denied having any knowledge regarding drugs and told the agents that Richard Lehr was a horse trainer. On cross examination at trial, Nattress testified he had lied to the agents regarding his knowledge of Richard Lehr's involvement in distributing drugs. N.T. 2.66. Later on cross-examination, Nattress testified that in October or November, 1980, he again spoke with the DEA agents. It was at this time Nattress began cooperating with the Government. Over defendant's objection, Nattress on re-direct examination testified that he began his cooperating with the Government because of a threat he received from Steven Lehr. Apparently when at the wedding of a mutual friend, Nattress and defendant drove to a bar and there defendant questioned him regarding his contacts with DEA agents. After Nattress tried to reassure defendant that he would not reveal his knowledge of the drug selling operation to the agents, defendant shook his finger at Nattress saying that "dead men tell no tales". Ruling that the probative value of this evidence was not substantially outweighed by its prejudicial nature, I admitted the testimony to rebut the inference raised on cross-examination that because Nattress had lied to the DEA agents in March, 1980, he also lied to them in November, 1980, and had lied at trial, and, in addition, to allow the Government to elicit the circumstances of Nattress' cooperation. There was no error in my ruling.

While courts have stated that death-threat testimony should be received only when clearly needed by the prosecution and after balancing its prejudicial nature with its probative value pursuant to Federal Rule of Evidence 403, such testimony is normally admitted "where cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness' credibility ...". *United States v. Check,* 582 F.2d 668, 685 (2d Cir. 1978), quoting *United States v. Panebianco,* 543 F.2d 447, 455 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977). *See United States v. DeLillo,* 620 F.2d 939 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 107, 66 L.Ed.2d 41 (1980); *United States v. Cirillo,* 468 F.2d 1233 (2d Cir.1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973). Under those circumstances, the prosecution should be given the opportunity to set the record straight on re-direct examination with death threat testimony.[8] *United States v. DeLillo, supra; United States v. Check, supra; United States v. Panebianco, supra; United States v. Cirillo, supra.*

Here, the cross-examination of Nattress regarding his contacts with DEA agents left the jury with the unrebutted contention that because Nattress had lied in March, he lied on subsequent occasions and at trial. The Government, therefore, was entitled to rebut this inference on redirect examination by allowing Nattress to explain why he changed his story. In fact, on re-direct examination Nattress testified that after he was threatened, he feared for his life, and decided to cooperate with the Government so everyone would be caught and he would not be killed. N.T. 2.90. Thus, the death threat testimony became extremely probative by virtue of defendant's cross examination of Nattress,[9] and its

---

**8.** Alternatively, death threat testimony often is admissible to show consciousness of guilt. *United States v. Gonsalves,* 668 F.2d 73 (1st Cir.), *cert. denied,* 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982); *United States v. Cirillo, supra.*

**9.** Earlier, during the Government's direct examination of Nattress, I excluded the very same evidence because it lacked any probative value.

prejudicial effect did not substantially outweigh its probative value.[10]

 Finally, defendant claims I erred in refusing to allow Nattress to be cross-examined regarding an alleged beating his girl friend, Patty Richards, received from defendant's sister-in-law, Linda Lehr. Defendant contends this testimony was relevant to show bias by Nattress against Linda Lehr and her family, including defendant. I refused to allow this testimony into evidence on the theory that it was too remote to be probative of Nattress' alleged bias against the defendant.

Cross-examination of a witness is subject to the discretion of the trial judge so long as defendant's sixth amendment right to confrontation is not infringed. *United States v. Tracey,* 675 F.2d 433 (1st Cir. 1982); *United States v. Crumley,* 565 F.2d 945, 949 (5th Cir.1978). Exclusion of evidence relevant to bias or motive to testify does not require reversal when the jury possesses "sufficient information to make a discriminating appraisal of the witness' possible motives for testifying falsely in favor of the government." *United States v. James,* 609 F.2d 36, 47 (2d Cir.1979). *See United States v. Lawson,* 683 F.2d 688, 693 (2d Cir.1982); *United States v. Tracey, supra.* While defendant in his cross-examination of a key government witness who is an informant must be given wide latitude, *United States v. Uramato,* 638 F.2d 84, 86 (9th Cir.1980), the trial judge, as with all evidence, first must determine whether the evidence is probative of bias, and if so, admit it only if its probative value is not substantially outweighed by its prejudicial effect.[11] *United States v. Diecidue,* 603 F.2d 535, 550 (5th Cir.1979).

Here, defendant's proposed evidence of bias did not reach first base. The fact that Nattress' girlfriend was beaten up by Richard Lehr's wife had virtually no probative value as to Steven Lehr. Such a contention is too remote and attenuated. Certainly, defendant's evidence would be probative of bias if the witness was testifying against Linda Lehr, but to have allowed such evidence in Steven Lehr's trial would have diverted the jury's attention to a collateral matter that was completely unrelated to issues being tried. In his offer of proof, defendant argued that any bias against Linda Lehr would also be bias against Steven Lehr by virtue of the family relationship. That simply is not true. For example, in *Chipman v. Mercer,* 628 F.2d 528 (9th Cir.1980), the Court of Appeals for the Ninth Circuit granted relator's petition for habeas corpus because the trial court in the underlying criminal case had refused to allow inquiry on cross-examination regarding possible bias and prejudice of a witness. Noting that the trial court cannot restrict cross-examination so as to infringe defendant's sixth amendment right to confrontation, the court opined that it would not be error for the trial court to exclude as collateral an inquiry attempting to show bias because a witness disliked a relative of the

**10.** Defendant also asserts I erred in refusing his motion for mistrial after Nattress mentioned that he was in the witness protection program. At the time of the testimony, the evidence of the death threat had not yet been admitted. In refusing defendant's motion, I noted the jury was aware defendant had been indicted with eleven others, and there was no testimony linking Nattress' fear to the defendant, and thus defendant suffered no prejudice. There was no error in my ruling.

Although defendant did not press the issue at trial he now contends it is likely that after hearing the death threat testimony, the jury linked Nattress' entry to the witness protection program with defendant's threat, and thus to defendant. Assuming this is true, a mistrial still would have been unwarranted because once the death threat testimony was admitted, the fact of Nattress' entry to the witness protection program was relevant to lend credibility to Nattress' fear. *See United States v. Ciampaglia,* 628 F.2d 632, 640 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980) (noting that no court has held disclosure of participation in the witness protection program to be grounds for mistrial).

**11.** The Federal Rules of Evidence do not attempt to establish rules governing every situation when evidence can be used to impeach a witness. *United States v. Alvarez-Lopez,* 559 F.2d 1155, 1158 (9th Cir.1977). Therefore, that the particular situation here is not addressed in article 6 of the Federal Rules of Evidence, dealing with impeachment, is of no consequence.

defendant for reasons unrelated to the case or the defendant. *Id.* at 531. This example of irrelevance is one step closer than the situation presented here. In this case, it was a *friend* of the witness who disliked a relative of defendant. Moreover, never once did defendant explain whether or how the alleged beating of Nattress's girlfriend either was connected to the drug selling conspiracy, to the defendant, or to the witness. Defendant's sole theory of relevance was based on the family connection between defendant and Linda Lehr. As previously explained, that fact standing alone was insufficient to show its relevance to Nattress' bias towards defendant, and thus, it was not error to exclude the testimony of the beating.

### Court's Charge and Jury Deliberations

Defendant contends I erred in refusing certain of his requests for charge, in certain aspects of my charge, and in the manner in which I responded to a question submitted by the jury during its deliberations. All of defendant's contentions are meritless.

 As to defendant's requests for charge, I have been directed to the proposed instructions [12] I refused, but not told how what I said or refused to say prejudiced defendant. Notwithstanding the deficiencies in defendant's presentation of these issues, "[a] party has no vested interest in any particular form of instruction; the language of the charge is for the trial court to determine." *Olsen v. United States,* 521 F.Supp. 59, 63 (E.D.Pa.1981), *aff'd mem.,* 688 F.2d 820 (3d Cir.1982); *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 757 (3d Cir.1976). When the charge is viewed in its entirety, if the jury has been fairly and adequately instructed, the requirements of the law have been satisfied. *Olsen v. United States, supra; James v. Continental Insurance Co.,* 424 F.2d 1064, 1065 (3d Cir.1970). Suffice it to say that my instructions regarding reasonable doubt and the law of conspiracy were correct and did not prejudice defendant.

12. The proposed instructions at issue were numbers 6 and 15, and respectively dealt with

As to the charge given, defendant first contends I erred in charging generally regarding the credibility of witnesses. Essentially, I told the jurors they could either disbelieve all of a witness' testimony if they found he lied once, or they could examine carefully the witness' entire testimony and choose what to believe and disbelieve. I further explained that the latter course seemed to be the more sensible of the two. Defendant has neither explained what I should have done differently nor how he was prejudiced by the instruction as given. My instruction correctly stated the law and did not force the jury to adopt one course over the other. Accordingly, there was no error.

Second, defendant argues I erred when, during my charge, I criticized the example used by defense counsel in his closing argument to explain reasonable doubt. Commenting on the reasonable doubt standard in relation to the testimony of William Nattress, counsel stated:

Now does William Nattress' testimony create a reasonable doubt as to his credibility? Because there is absolutely, positvely (sic) no corroboration of what Billy Nattress says relative to coke. There is none.

How about if you went to the doctor, your son, your daughter, you take him to the doctor, and when you take him to the doctors, the doctor examines him and say, "Well, I'm afraid we have to amputate his legs," your son's legs, and you say, "What's the problem?" And the doctor says, "Well, he's got Nattreitis," and you say, "What's that?" He say, "Well, if you believe everything William Nattress said then he must have it."

Would you hesitate to have your son's legs chopped off, have them amputated upon the testimony of William Nattress alone? Would you hesitate? Weren't there enough inconsistencies in that testimony just to stop you?

N.T. 3.90–91.

Responding in my charge, I stated:

the reasonable doubt standard and how a conspiracy could and could not be proved.

In his argument to you, Mr. Madden suggested that the burden resting upon the Government to prove guilt beyond a reasonable doubt could be understood in the terms of what might be considered and done if your child had some problem and it was suggested by the doctor that he or she would have to have a leg amputated. I don't think Mr. Madden should have made this argument to you for several reasons.

In the first place, it's my job to instruct you upon the law and not his. In the second place, his illustration was improper for a variety of reasons. Any mention of children and the possibility that the child might lose a limb, have a leg amputated, something like that, immediately invites some sort of emotional response from most everybody. As I told you before, this case is not to be tried on the basis of emotion, but is to be tried on the basis of the law and the evidence.

Secondly, his illustration dealt with medical matters which are often subject to laboratory tests and proof of a type not available in the law, and then again his illustration suggested that the proof required of the Government in this case might be equated with proof which leaves little or no room for doubt, or proof to the highest certainty, the highest quality of proof that can be obtained. These are higher standards established than are required of the Government. The Government must establish guilt beyond a reasonable doubt, and insofar as Mr. Madden suggested to you a greater burden on the Government he was in error.

N.T. 4.11–12. For the reasons stated on the record, my comments were proper and I acted well within my sound discretion in correcting counsel's characterization. *See e.g., United States v. Vario,* 484 F.2d 1052 (2d Cir.1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 753 (1974) (trial judge acted properly in informing jury that defense counsel's urging for them to apply the "Golden Rule" was error); *United States v. Jackson,* 470 F.2d 684 (5th Cir.1972), *cert. denied,* 412 U.S. 951, 93 S.Ct. 3019, 37 L.Ed.2d 1004 (1973) (trial judge may ad-

monish counsel who make improper comments); *Cooper v. United States,* 403 F.2d 71 (10th Cir.1968) (no reversible error when trial judge, in presence of jury, commented that defense counsel's statement regarding an exhibit was ridiculous).

Finally, defendant asserts I erred in responding to a question submitted by the jury during its deliberation. Shortly after the jurors retired to deliberate they submitted a question to me which stated, *inter alia:* "Please define drawing a line and cutting a line." I discussed the matter with counsel, solicited their suggestions as to how to respond, and over defense counsel's objection, answered in pertinent part:

It is my recollection of the evidence that reference was made to drawing a line of cocaine and referring to putting cocaine out on a table or some other place in a line and that was then used by the persons who were there to use cocaine. Whether or not that same thing was referred to as cutting a line is a matter for you to recall.

But, let's assume that both terms were used, I think that it would mean the same thing. That is, drawing a line or cutting a line, as I recall the testimony, means putting cocaine out on a table so that it would be readily available for use by someone.

Now, there was also testimony, as I recall it, but, again, I remind you that it is up to you to recall it, not me, that cutting—not cutting a line, but cutting cocaine was referred to in another sense and that was in the sense that a neutral substance or a diluted or an adulterant of some kind is added to cocaine so that the strength is reduced, and it's my recollection that there was testimony that cocaine was cut by the adding of an adulterant or a dilutant of some kind. Whether or not that was used in the sense of cutting a line, or whether that was used at all, what was said is a matter for you to recall and, as I say, base it upon your recollection and your evaluation of the testimony, not mine.

N.T. 4.65–66. Counsel argues that while my definition of drawing or cutting a line as regards personal use of cocaine was proper, my response defining cutting cocaine as diluting it with an adulterant was gratuitous, improper, and thus prejudiced defendant. I disagree.

Questions from a jury should be disclosed to counsel who then should be given the opportunity to suggest an appropriate response. *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir.1981). Once a question comes from the jury, "it is for the trial judge to construe ... [it] and to determine the content and form of the answer to be returned." *United States v. DeLaTorre*, 605 F.2d 154, 156 (5th Cir.1979). Moreover, in his discretion, the trial judge may in answering the question, provide an explanation or clarifying response. *United States v. Curtis*, 494 F.Supp. 279, 285 (E.D.Pa. 1980), *reversed on other grounds*, 644 F.2d 263 (3d Cir.1981).

Here, the response given was necessary to answer the question fully in light of its ambiguity. It was my recollection and the Government's that William Nattress referred to putting cocaine on a surface for personal use as "drawing a line" and diluting cocaine with an adulterant as "cutting cocaine". It also was my recollection that there was no reference to "cutting" with respect to personal use. While defense counsel agreed that the term "cutting" was used when referring to diluting cocaine with a neutral substance, his recollection was that the term also has been used in the same sense as "drawing a line" for personal use. Because of this belief, counsel urged that I respond to the jury within the strict confines of the question by only referring to preparation of cocaine for personal use.[13]

A review of the notes of testimony reveals that William Nattress referred to both "drawing" and "cutting" with respect to personal use of cocaine and to "cutting" as diluting cocaine with a neutral substance. N.T. 1.70–78. Because the jury's question asked me to define "drawing" and

"cutting" had I responded as defense counsel wished, I would have misled the jury by suggesting that the term "cutting" only was used in reference to personal use of cocaine. Therefore, my response was proper and did not prejudice defendant.

*Conclusion*

For the aforementioned reasons, defendant's post trial motions must be denied.

---

**13.** Alternatively, defense counsel suggested that I respond by saying it was for the jury to rely on their own memories to recall the testimony.