UNITED STATES of America, Appellee,

v.

Clyde EDWARDS, Defendant–Appellant.

No. 1316, Docket 80–1129.

United States Court of Appeals, Second Circuit.

Argued June 25, 1980.

Decided June 25, 1980.

Opinion Filed Sept. 26, 1980.

Betty Santangelo, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., Gregory L. Diskant, Asst. U. S. Atty., New York City, of counsel), for appellee.

Daniel L. Meyers, New York City (Jerome M. Greenberg, New York City, of counsel), for defendant–appellant.

Before MULLIGAN and MESKILL, Circuit Judges, and HOLDEN *, District Judge.

MULLIGAN, Circuit Judge:

Clyde Edwards appeals from a judgment of conviction, 486 F.Supp. 673, (D.C.) entered on March 17, 1980 in the Southern District of New York after a seven day jury trial before the Honorable Edward Weinfeld, United States District Judge, and a jury. Count One of the second superseding indictment charged Clyde Edwards, Carlene Baker and others, known and unknown, with a continuing conspiracy to manufacture and distribute phencyclidine (PCP) in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and 841(b)(5). Count Two charged Edwards and Baker with aiding and abetting the manufacture of PCP. Edwards pleaded not guilty to both counts. After the trial of Edwards and Baker, the jury returned guilty verdicts against defendant Edwards on both counts.[1] Judge Weinfeld sentenced Edwards to concurrent fifteen month terms of imprisonment on both counts, to be followed by a special parole term of three years. This appeal followed.[2]

The evidence at trial, viewed in the light most favorable to the Government as it should be on appeal, established that Edwards and others, including defendant Baker, participated in a scheme to assist manufacturers of PCP, or angel dust, a particularly dangerous drug. The evidence showed that Edwards and Baker were employees of Berg Chemical Company ("Berg"), a distributor of chemicals, during the period of the conspiracy. Baker was a receptionist who received cash orders from off–the–street customers. In that capacity she was also responsible for contacting the Drug Enforcement Administration ("DEA") when off–the–street customers purchased certain precursor chemicals which were listed on a DEA watch list and were essential to the manufacture of PCP. Edwards was a warehouseman whose duties included the physical delivery of chemicals to customers once they had placed their orders.

The evidence at trial established that Edwards demanded money from certain individuals whom he knew to be dealers in PCP in return for a promise of protection from the DEA. Since defendant Baker was Edwards' girlfriend, Edwards was able to assure the PCP manufacturers that the DEA would not be notified of their purchases of precursor chemicals. As a result of this scheme, several manufacturers of PCP were able to operate successfully without the intervention of the DEA for several years.

The evidence at trial was presented through the testimony of three accomplice witnesses, two DEA agents involved in the precursor control program, one DEA undercover agent, two Berg employees and five tape recordings.

---

* Honorable James S. Holden, United States District Judge for the District of Vermont, sitting by designation.

1. The jury was unable to agree on a verdict as to co–defendant Baker. However, Baker was subsequently convicted after a later jury trial on March 26, 1980.

2. The panel originally decided this appeal and rendered an oral affirmance in open court on the day of argument, June 25, 1980. This formal opinion is issued in response to a motion by the Government.

## I

The first issue on this appeal is whether the district court properly excluded the testimony of two proposed defense witnesses. The general rule is that absent a clear abuse of discretion, the district court has broad discretion to exclude evidence that is irrelevant or cumulative. *United States v. Mangan*, 575 F.2d 32, 45 (2d Cir.), cert. denied, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978); Fed.R.Evid. 402, 403. No abuse of discretion occurred here.

The defense's purpose in calling the private investigator, Ralph Addonizio, was to demonstrate that anyone could purchase precursor chemicals from Berg and under fictitious identification. But this point was conceded by the Government and was in fact established by Government witnesses.

The defense's purpose in calling the expert witness, Amos Turk, a professor of chemistry, was to establish that the precursor chemicals for PCP had multiple legal uses. However, the Government's expert witness had so testified on cross-examination, and this point was conceded by the Government before the jury.

Finally, it should be noted that both points the defense sought to establish through these two proposed witnesses were argued in summation by defense counsel based on the record. Further, Judge Weinfeld clearly instructed the jury that the precursor chemicals were not illegal and that they could be freely bought and sold.

## II

The second issue raised on this appeal is whether the district court improperly permitted the Government to examine two witnesses on direct examination regarding cooperation agreements they had made with the Government. The crucial case in this circuit in the area of cooperation agreements is *United States v. Arroyo–Angulo*, 580 F.2d 1137 (2d Cir. ), cert. denied, 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978). In that case, this court ruled that while the Government's introduction of a cooperation agreement on its redirect examination of a witness whose credibility had been attacked

was proper, the Government should not be permitted to introduce the agreement into evidence on direct examination. The court continued that to permit the admission of the agreement into evidence on direct examination would "run[ ] afoul of the well established rules of evidence that absent an attack on the veracity of a witness, no evidence to *bolster* his credibility is admissible." 580 F.2d at 1146 (emphasis added).

In the instant case, no bolstering of the two Government witnesses occurred when they were examined on direct regarding the cooperation agreements. In fact, the examination on direct constituted an impeachment by the Government of its witnesses.

In *Arroyo–Angulo*, this court recognized that the existence of the cooperation agreement has "created a double–edged sword and it is debatable which edge cut more deeply." 580 F.2d at 1146. However, the court did conclude that "although the use of a cooperation agreement cuts both ways insofar as it suggests not only a promise to testify truthfully, but also a motive to testify as the Government wished (regardless of where the truth may lie), *the agreement, when introduced by the Government, is used primarily to bolster the credibility of a witness."* United States v. Barnes, 604 F.2d 121, 151 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980) (emphasis added) (construing *Arroyo–Angulo*).

It is also the rule in this circuit that: although credibility generally may not be supported until it has first been attacked, an exception exists which allows the Government to bring out on direct examination the circumstances surrounding a witness' motivation for cooperating with the Government or other matters damaging to the witness' credibility. *United States v. Blackwood*, 456 F.2d 526 (2d Cir.), cert. denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972); *United States v. Del Purgatorio*, 411 F.2d 84, 87 (2d Cir. 1969); *United States v. Rothman*, 463 F.2d 488, 489–90 (2d Cir.), cert. denied, 409 U.S. 956, 93 S.Ct. 291, 34 L.Ed.2d 231

(1972); *United States v. Di Francesco*, 604 F.2d 769, 775 (2d Cir.), pet. for cert. granted on other grounds, 444 U.S. 1070, 100 S.Ct. 1012, 62 L.Ed.2d 751 (1980). Admission of this evidence is permitted in order to avoid an inference by the jury that the Government is attempting to keep from the jury the witness' possible bias.

*United States v. Singh*, 628 F.2d 758, 761 (2d Cir. 1980).

██ The rule of *Arroyo–Angulo* and the doctrine enunciated in *Singh* indicate that the Government may not introduce the entire cooperation agreement on direct examination of its witness since the witness' credibility has not been attacked and the *entire* cooperation agreement bolsters more than it impeaches. See *Barnes, supra.* However, the elicitation of the fact of the agreement and the witness' understanding of it, as a motivation for the witness to testify for the Government, should be permitted on direct examination in order to anticipate cross–examination by the defendant which might give the jury the unjustified impression that the Government was concealing this relevant fact.

██ The Government in this case adhered to the proper procedure for "impeaching" its cooperating witnesses on direct. The prosecutor did not refer to the cooperation agreements at all in her opening. On direct examination of both witnesses, the prosecutor elicited the fact that a cooperation agreement had been signed, had the witness identify the agreement, and then asked the witness to explain "your understanding of the terms of the agreement." The understanding was that the witnesses would receive favorable treatment if they testified for the Government. On direct examination of each witness, the prosecutor did not offer the written cooperation agreement into evidence. Thus, the jury did not learn at that time that the agreement was revocable if the witness perjured himself, that upon such perjury the witness might be subject to prosecution for any and all crimes, and anything the witness had previously said could be held against him. All

these points not mentioned on direct comprise the bolstering portions of the cooperation agreement. The testimony of the witnesses on direct merely concerned the witnesses' motive to cooperate with the Government and thus constituted impeachment and not bolstering. It was, therefore, properly admitted.

Accordingly, the judgment of conviction is affirmed.