UNITED STATES of America, Appellee,

v.

Ann SMITH, Lisa Shay, a/k/a "Lisa Smith", Robert Smith, and Donna Smith, Defendants,

Ann Smith, Lisa Shay, a/k/a "Lisa Smith" and Robert Smith, Defendants-Appellants.

Nos. 96, 97 and 138, Dockets 85–1081, 85–1088 and 85–1099.

United States Court of Appeals, Second Circuit.

Argued Sept. 4, 1985.

Decided Dec. 3, 1985.

As Amended Feb. 26, 1986.

Donald N. Silverman, White Plains, N.Y. (Silverman & Sapir, of counsel), for appellant Lisa Shay.

Theodore Krieger, Westport, Conn., for appellant Ann Smith.

Barry B. Silver, Newburgh, N.Y. (Silver, Forrester & Schisano, of counsel), for appellant Robert Smith.

Warren N. Eggleston, Asst. U.S. Atty., New York City (Rudolph Giuliani, U.S. Atty., S.D.N.Y., John F. Savarese, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, PIERCE and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge.

Robert Smith, his sister, Ann Smith, and her daughter, Lisa Shay, appeal from judgments of conviction entered on jury verdicts in the United States District Court for the Southern District of New York, Lee P. Gagliardi, *Judge.* The appeal of the fourth defendant, Donna Smith, Robert's wife, was dismissed by order of this court dated July 1, 1985. All four defendants were convicted under 18 U.S.C. § 371 of conspiracy to violate 18 U.S.C. §§ 2312, 2313, and 844(i) by transporting, receiving, and destroying by fire stolen vehicles in interstate commerce. The four defendants were also convicted under 18 U.S.C. § 2313 of knowingly receiving, concealing, and disposing of a stolen vehicle that had been transported in interstate commerce—Robert and Donna with respect to a 1979 brown Corvette, and Ann Smith and Lisa Shay with respect to a 1980 white Corvette. We affirm the convictions of Robert Smith and Ann Smith. Since it is not clear whether the district court considered whether the interrogation of Shay violated her sixth amendment right to counsel, we remand her case to allow that court to address the issue.

## BACKGROUND

Alerted to problems with the title to two Corvettes, agents of the Federal Bureau of Investigation began an investigation that ultimately disclosed that the cars had been stolen. The government's primary source of evidence in this case was the testimony, given pursuant to a cooperation agreement with the government, of Roger Keller, a major participant in the crimes charged. The evidence established that Keller agreed with W.R. Smith to steal a Corvette for Smith's sister-in-law, Donna Smith.

Under the pretense of taking a test drive, Keller stole a 1979 brown Corvette bearing vehicle identification number (VIN) 1Z8789S404389 from a dealer in Tampa, Florida on June 10, 1983. Accompanied in another car by W.R. Smith, W.R.'s wife Prudence, and their three children, Keller drove the Corvette to the home of Robert and Donna Smith in Maybrook, New York. Robert Smith had earlier wired $500 to W.R. Smith in Florida to cover the expenses of the trip to New York.

Once the car was safely secreted in the Smith's garage, Keller, W.R. Smith, and Robert Smith discussed the need to remove the VIN number plate from beneath the window molding. After Donna Smith had paid Keller and W.R. Smith $2,500, the whole group sat down in Robert and Donna Smith's kitchen where Keller told them how he had stolen the car.

Several days after delivering the car to Robert and Donna Smith, Keller attended a picnic with the Smith family in Stroudsburg, Pennsylvania. While there, he was told by W.R. Smith that W.R.'s and Robert's sister, Ann Smith, was also interested in obtaining a stolen Corvette. On June 23, 1984, Keller, pretending to be a buyer responding to a classified advertisement, con-

vinced Marisa Esposito of Rocky Hill, Connecticut, to allow him to test drive her 1980 white Corvette, which bore VIN number 1Z878AS421083. Keller, again followed by W.R., W.R.'s wife Prudence, and their three children, drove to Honesdale, Pennsylvania, where they met Ann Smith and her daughter, Lisa Shay, at a motel and delivered the car in exchange for $6,000 from Ann Smith.

To conceal these two thefts, Keller next stole two VIN number plates from the Doug Griffith Chrysler-Plymouth dealership in Baltimore, Maryland, which he used to apply for new certificates of title in Virginia. Keller had informed Ann Smith that the VIN plate would have to be removed from the white Corvette, but she had been unsuccessful in efforts to do this. Therefore, Keller, W.R., and Prudence Smith went back to Honesdale, Pennsylvania, to meet with Ann Smith. Keller and Ann Smith then travelled approximately 20 miles outside Honesdale to a deserted church parking lot where they met Lisa Shay, who was waiting there with the white Corvette. With both Ann Smith and Lisa Shay present, Keller removed the original VIN plate and replaced it with one of those he had stolen in Baltimore. Shay then left in the Corvette, and Keller returned to Honesdale with Ann Smith.

Later that day, Keller drove to Robert and Donna Smith's home in Maybrook, New York, where he and W.R. Smith, in the presence of Robert Smith, attached the other stolen VIN plate to the 1979 Corvette. Following the receipt of the certificates of title from Virginia, both cars were ultimately registered—the 1979 Corvette in New York, and the 1980 Corvette in Pennsylvania.

Shortly after the FBI began to investigate the discrepancies in the titles to the vehicles, both cars were found burned, almost beyond identification. The 1980 Corvette was found approximately 3½ miles from Robert and Donna Smith's home in Maybrook, New York, while the 1979 Corvette was discovered in the rear of a truckyard at which Robert Smith was employed.

The latter car was located two days after an investigator for the New York Department of Motor Vehicles was told by Donna Smith that the car had been sold.

## DISCUSSION

### A. Ann Smith.

Ann Smith raises two grounds for appeal. First, she contends that on the redirect examination of Keller, the prosecutor's introduction into evidence of the cooperation agreement between Keller and the government was inherently prejudicial because it improperly bolstered Keller's credibility. On this issue the law in this circuit is clear. The entirety of a cooperation agreement between the government and a witness may not be admitted into evidence on direct examination before the credibility of that witness has been challenged. *See United States v. Borello*, 766 F.2d 46, 56 (2d Cir.1985). Although the prosecutor may on direct examination probe a witness's motivation for cooperating with the government, introduction of the entire agreement into evidence at that stage is viewed as prejudicial because it tends unduly to bolster a witness's credibility. *United States v. Edwards*, 631 F.2d 1049, 1052 (2d Cir.1980).

An exception to this general rule allows a prosecutor to elicit testimony on the truth-telling portions of a cooperation agreement on direct examination if the witness's credibility has been attacked by defense counsel in opening argument. *See United States v. Jones*, 763 F.2d 518, 522 (2d Cir.1985); *United States v. Maniego*, 710 F.2d 24, 27 (2d Cir.1983). Moreover, once a witness's credibility has been attacked on cross-examination, it is permissible for the prosecutor to introduce the entire agreement into evidence on redirect examination to rehabilitate that witness. *United States v. Edwards*, 631 F.2d at 1051 (citing *United States v. Arroyo-Angulo*, 580 F.2d 1137 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978)). Here, Judge Gagliardi correctly found that Keller's credibility had been at-

tacked by Ann Smith's counsel in both his opening statement and on cross-examination. Therefore, under our precedents the introduction of the cooperation agreement during the prosecution's redirect examination of Keller was proper.

■ Ann Smith's second contention is that certain statements made in summation by the Assistant United States Attorney were prejudicial. It is well-settled that both the "prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments", provided they do not misstate the evidence, refer to facts not in evidence, or express counsel's personal belief as to guilt or innocence. *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir.1978). We have reviewed all of Ann Smith's objections to the summation, but find only one of them worthy of discussion here. The objection we address is the prosecutor's argument in summation "that the defense story simply defies common sense. In deciding whether the defense story is true, you can consider interest. No one has a greater, more personal interest in the outcome of this case than the defendants." After a defense objection to this statement was overruled, the prosecutor continued: "It is for you to decide whether that great interest has shaped defendants' story." Ann Smith protests that this amounted to prejudicial error because it suggested to the jury that she was a liar.

■ Even assuming that it would have been improper for the prosecutor expressly to state that Ann Smith was lying, *compare United States v. Drummond*, 481 F.2d 62, 64 (2d Cir.1973) (conviction reversed when prosecutor stated, *inter alia*, that defendant's "testimony is so riddled with lies it insults the intelligence of 14 intelligent people sitting on the jury") *with United States v. White*, 486 F.2d 204, 206–07 (2d Cir.1973) (prosecutor's two assertions that defendant was lying, and repeated statements that defendant's story was fabricated, held not to warrant reversal, since prejudice to defendant was minimal), *cert. denied*, 415 U.S. 980, 94 S.Ct.

1569, 39 L.Ed.2d 876 (1974) *and United States v. Williams*, 529 F.Supp. 1085, 1106–07 (E.D.N.Y.1981) (prosecutor's contention in summation that defendants had lied in their trial testimony held proper because it was supported by the evidence and it focused the issues for the jury), *aff'd*, 705 F.2d 603 (2d Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983), the prosecutor here did little more than describe the defendants' interest in the outcome as greater than anyone else's interest. In effect, the prosecutor merely focused attention on the central issue of credibility.

We have indeed found prejudice in a district judge's charge that "the interest of a defendant in the result of a criminal trial is of a character possessed by no other witness," when that charge was given in conjunction with an instruction that bolstered an accomplice informant's credibility. *See United States v. Assi*, 748 F.2d 62, 68 & n. 8 (2d Cir.1984). However, the statement here was made not by the court, but by the prosecutor in summation, and we have repeatedly held that final arguments of counsel may be vigorous and robust if based on the evidence in the record. *See, e.g., United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974); *United States v. Brown*, 456 F.2d 293, 295 (2d Cir.), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972). Moreover, the district judge here later charged the jury on the issue of interest that:

> In appraising a defendant's credibility, you may take into consideration the fact of defendant's interest. However, it by no means follows that simply because a person has a substantial interest in the result, that he or she is not capable of telling a straightforward or truthful story. It is for you to decide to what extent, if at all, that interest has affected that witness's testimony.

This charge cured any prejudice that might have resulted from the prosecutor's remarks on interest.

## B. *Robert Smith.*

■ Robert and Donna Smith, husband and wife, were represented at trial by the same attorney. Robert's sole contention on appeal is that his convictions should be reversed because he was not warned of his right to separate representation. In instances of proposed joint representation the court must inquire into that representation and advise each defendant of his right to effective assistance of counsel, including the right to separate representation. Fed. R.Crim.P. 44(c). "Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." *Id.* A party may, however, waive this right to separate representation and proceed with joint representation, provided the waiver is knowing and intelligent. *See United States v. Curcio,* 694 F.2d 14, 24 (2d Cir.1982) (quoting *United States v. Curcio,* 680 F.2d 881, 887 (2d Cir.1982)).

Robert's attorney on this appeal, Barry B. Silver, who was not his counsel at trial, stated in his brief to this court that "the joint representation of Robert Smith by the attorney who also represented his wife should have been the subject of judicial scrutiny. *The record indicates that such inquiry did not occur*" (emphasis added). Again, at the conclusion of his brief, Mr. Silver wrote, "The record does not indicate that Robert Smith was *ever* warned of the dangers of dual representation * * *" (emphasis added). These formal statements to this court are nothing short of bald misstatements of what occurred.

In actuality, at a pretrial conference held on October 26, 1984, Robert and Donna were both extensively questioned and warned on the record by Judge Gagliardi of the dangers of joint representation. After he concluded his detailed explanation of the potential disadvantages of proceeding with the same attorney, both defendants expressed their desire to be jointly represented by the same trial counsel.

■ Confronted at oral argument with his blatant misstatement of the record, Mr. Silver claimed that he meant to suggest that the defendants were not cautioned once the trial had begun. We do not credit his lame explanation. In any event, there is no requirement that parties who have received adequate pretrial warnings on the dangers of joint representation be warned again after the trial begins. Indeed the preferable time for the warning is a period sufficiently in advance of trial to permit new counsel to be engaged without delaying the trial. In light of the record consent given after Judge Gagliardi's careful pretrial inquiry and explanation, we hold that Robert Smith validly waived his right to separate representation.

## C. *Lisa Shay.*

Lisa Shay raises two issues on her appeal: first, whether a statement she made to an FBI agent was taken in violation of her sixth amendment right to counsel, and therefore should have been suppressed; and second, whether there was insufficient evidence to sustain her convictions on the conspiracy and substantive counts.

Shay, who was 21 years old at the time, was arrested in her home in Galilee, Pennsylvania, on September 26, 1984, pursuant to a warrant issued on a complaint. Following her arrest, she was handcuffed and placed in the FBI agent's car for a ride from Galilee to Scranton, Pennsylvania, which lasted approximately one hour. The arresting officer testified that, once in the car, he gave Shay a copy of the arrest warrant and the complaint and read to her the "standard interrogator advice of rights form"; that he informed her that she was to be taken before a magistrate; that she nodded affirmatively when asked if she understood her rights; that Shay indicated she did not want to discuss the case; that she was not questioned about the case during the trip to Scranton; and that she was crying quietly when she was first arrested, but appeared calmer upon arrival at the FBI office in Scranton.

After being fingerprinted and photographed in Scranton, Shay was questioned

by a different FBI agent, agent Glasgow. Agent Glasgow testified that he read Shay her rights at the beginning of the interview and provided her with a copy of the interrogation advice of rights form; that Shay stated that she understood the form and signed it; that he told Shay at the interview that she would be taken before a magistrate and, that, if she cooperated, there was a possibility that nominal bail would be set; and that Shay had begun to make a statement when the interview was interrupted because the magistrate was ready to proceed.

Following her presentment before the magistrate, Shay was released on her own recognizance. Asked at the suppression hearing if the magistrate had advised Shay of her rights, agent Glasgow responded: "Yes, sir. He has a canned speech, for lack of a better word, of the various things he must go over in these proceedings, and her advice of rights was provided to her by the magistrate at that time." Glasgow stated that he had assumed that as a "cooperating person" Shay would continue the interrupted interview, and that after Shay had completed whatever steps the magistrate ordered her to take to be released on her own recognizance, she voluntarily returned to Glasgow's office to continue the interview. Shay testified, however, that Glasgow had escorted her back to the interrogation room after her appearance before the magistrate. In any event, when she did return to the interrogation room, whether escorted or on her own, Shay provided incriminating information about the car transactions. From this information Glasgow dictated a statement that was typed and subsequently read, initialled, and signed by Shay. Shay was not assisted by counsel at any point during the proceedings; Glasgow recalled that Shay did not request that counsel be present. Shay was subsequently indicted along with the other defendants on October 9, 1984.

A suppression hearing was held on November 30, 1984, to determine whether Shay had knowingly, intelligently, and voluntarily waived her rights, including her right to counsel, before making her incriminating statement to Glasgow. Crediting the testimony of the FBI agents, Judge Gagliardi found that Shay had been adequately informed of her rights and, therefore, had made a knowing and voluntary waiver.

■ We assume that under the circumstances the two warnings by the agents and the additional "canned speech" by the magistrate adequately met the requirements of *Miranda* and the fifth amendment. However, it seems clear that waiver of the right to counsel under the sixth amendment is to be measured by a stricter standard than is a similar waiver under the fifth amendment. *See United States v. Mohabir*, 624 F.2d 1140, 1146 (2d Cir.1980); *see also United States v. Massimo*, 432 F.2d 324, 327 (2d Cir.1970) (Friendly, J., dissenting), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971). Shay's primary argument on appeal is that, even if the government did establish that she waived her fifth amendment right to counsel, it nevertheless failed to satisfy the stricter standard for waiver of the sixth amendment right, which she claims attached at her presentment before the magistrate.

To avoid having an uncounseled pretrial proceeding govern the accused's fate, the Supreme Court in construing the sixth amendment guarantee has held that the right to counsel applies to " 'critical' stages of the proceedings." *United States v. Wade*, 388 U.S. 218, 224, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967). Nevertheless, the parameters of the sixth amendment right to counsel have not yet been neatly defined. "[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). The instances in which the initiation of adversary judicial proceedings have been found to give rise to a sixth amendment right to counsel include "for-

mal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689, 92 S.Ct. at 1882. The Court, however, has never held that the sixth amendment right to counsel attaches at the time of arrest. *United States v. Gouveia,* 467 U.S. 180, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984). Furthermore, this court has decided that the sixth amendment right to counsel does not arise at the time of arrest upon a warrant following the filing of a complaint. *United States v. Duvall,* 537 F.2d 15, 22 (2d Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).

Shay asks us to hold that the presentment before the magistrate following her arrest on a warrant issued upon a complaint was a "critical stage" that triggered her sixth amendment right to counsel, and that the government failed to satisfy the stricter standard of waiver thereby required. The government, in turn, asks us to assume, without deciding, for the purposes of this case that Shay's sixth amendment right to counsel did attach at her presentment before the magistrate, and to hold that Shay waived that right.

■ We decline to take the course proposed by either party, however, because it is unclear whether Judge Gagliardi, in reaching his decision at the suppression hearing, considered the waiver issue in terms of both the fifth and sixth amendment rights to counsel. After the suppression hearing the district judge rendered an oral decision holding that Shay's statement was voluntary and admissible and that there was "a knowing waiver". He focused on Shay's intelligence and education and simply concluded:

> Her testimony on the stand, her demeanor, indicates she is quite literate, and she was intelligently in possession of sufficient intelligence and did have a knowing waiver, and it is the judgment and decision of this Court that the statement is voluntarily given and after having been advised and understanding and acknowledging her rights, and therefore the statement will be admissible.

He did not indicate whether his findings were intended to address her fifth amendment right, or the sixth, or both.

We think the issue presented here is too important to be decided on the basis of a concession by the government, especially without the benefit of the district judge's initial analysis and consideration of the specific questions presented. Not yet settled are the precise instances in which a sixth amendment right to counsel arises in addition to the right to counsel derived from the fifth amendment privilege against self-incrimination. The case law of this circuit recognizing the stricter standard for waiver under the sixth amendment was born in post-indictment and post-arraignment circumstances. *See United States v. Mohabir,* 624 F.2d at 1146–48 (discussing cases). The initial appearance before a magistrate at issue here reflects an earlier stage of the proceedings against the accused and, therefore, may implicate different rights. In addition, it is not clear what "more" may be needed to satisfy the stricter standard of waiver in each of the various situations in which the sixth amendment right may enter the picture. In the absence of a clear determination below of whether the sixth amendment right applied, and if so whether its stricter standard was met, we hesitate to act because we are unable effectively to review the issue.

For this reason, we remand Shay's case to the district court to allow it to reconsider Shay's motion to suppress the incriminating statement she made to agent Glasgow. On remand, the court should address separately the applicability to this case of Shay's fifth and sixth amendment rights and whether applicable rights were waived. If convenient, any future appeal should be referred to this panel.

■ As to Shay's contention that the evidence was insufficient to sustain her conviction, we must reject her initial argument that the evidence was insufficient even if her signed statement is held to be admissible. The combination of her presence at the scene with her mother when the car was delivered by Keller and paid for by

her mother, her presence at the scene when the car's VIN plate was changed, and her admissions that she assisted in the disposal of the vehicle and made false statements to investigators regarding the circumstances of the car's disappearance provided a sufficient basis for the jury to conclude beyond a reasonable doubt that Shay was a knowing participant in the conspiracy and that she knowingly participated in the substantive offense by aiding in the disposal of the stolen vehicle. We do not decide, however, whether the evidence would have been insufficient absent Shay's statement, or, if the district court so determines what the consequences would be, *see Green v. Massey*, 437 U.S. 19, 26 n.9, 98 S.Ct. 2151, 2155 n.9, 57 L.Ed.2d 15 (1978).

## CONCLUSION

Ann Smith's and Robert Smith's convictions are affirmed. Lisa Shay's conviction is remanded to the district court for further consideration in accordance with this opinion.